WEIDENAAR, RESPONDENT, *v.* NEW YORK LIFE INSURANCE CO., APPELLANT.

(No. 2,503.)

(Submitted February 17, 1908.   Decided February 25, 1908.)

[94 Pac. 1.]

*Life Insurance—Agents—Fraud—Constructive Notice—Negligence—Ratification.*

Life Insurance—Agents—Ostensible Authority—Constructive Notice—Fraud—Negligence.

1.   Plaintiff, a foreigner unable to read the English language well, was induced by one C., as agent for a life insurance company, to sign a note as payment of the first premium on a policy in C.'s company. He was rejected and without knowledge of his rejection was later induced by C. to sign a new note, payable to C. and one S., for a policy in a different company, C. falsely introducing S. to plaintiff as the agent of the latter company, and handing to plaintiff for signature an application blank which he had obtained from the local agency director of that company, for the alleged purpose of securing the application on a commission.   Plaintiff made no inquiries as to why C. should assume to act for the latter company, and the only ostensible authority exhibited to him by C. was the application blank.   Plaintiff in the presence of a number of others signed the note and application without endeavoring to ascertain their contents or requesting some one to read them to him.   While the company represented by the agency director had knowledge of the fact that in some instances it was getting brokerage business, plaintiff had no knowledge of this.   The company obtained no part of the proceeds of the note.   In the receipt given to plaintiff no reference was made to the company.   On rejection of his new application plaintiff brought suit to recover the amount of the second note.   *Held*, that he was charged with constructive notice of the restriction upon C.'s authority in the premises, and

that he was guilty of such gross negligence as precluded him from re-
covering from the defendant company.

Same—Ratification.

2. The transaction referred to in the foregoing paragraph cannot be
said to have been ratified by the defendant company, where neither it
nor its agents had knowledge of it until long after the application had
been rejected.

*Appeal from District Court, Gallatin County; Thos. C. Bach,
Judge.*

ACTION by John Weidenaar against the New York Life Insur-
ance Company to recover money paid on an insurance premium
note. From a judgment for plaintiff, and an order denying a
motion for a new trial, defendant appeals. Reversed. Mr. Jus-
tice Holloway dissents.

*Messrs. Hartman & Hartman,* for Appellant.

The persons dealing with Weidenaar were not actual or osten-
sible agents of the New York Life Insurance Company, nor were
their acts ever ratified by the company. The essential element
of ratification is the adoption of the agent's act by the principal
with full knowledge of all the circumstances relating thereto.
This element is entirely lacking in the case at bar. (*Suderman
Co.* v. *Rogers* (Tex. Civ. App.), 104 S. W. 195; *Thompson* v.
*Laboringman's etc. Co.,* 60 W. Va. 42, 53 S. E. 908, 6 L. R. A., n.
s., 311; *Britt* v. *Gordon,* 132 Iowa, 431, 108 N. W. 319; *Owings*
v. *Hull,* 9 Pet. (U. S.) 607, 9 L. Ed. 236; *Fitzgerald* v. *Kimball
Co.* (Neb.), 107 N. W. 227; *Cowan* v. *Sargent Co.,* 141 Mich. 87,
104 N. W. 377; *Valley Bank* v. *Brown* (Ariz.), 83 Pac. 362.)

It devolves upon a person dealing with another whom he sup-
poses to be an agent for a third person to ascertain at his peril
whether in fact the supposed agency exists. (*Moore* v. *Skyles,*
33 Mont. 135, 114 Am. St. Rep. 801, 82 Pac. 799, 3 L. R. A.
n. s., 136; *Nord* v. *Boston & Montana Min. Co.,* 33 Mont. 464, 84
Pac. 1116, 89 Pac. 647; *Dodge* v. *Birkinfeld,* 20 Mont. 115, 49
Pac. 590; *Helena National Bank* v. *Rocky Mt. Tel. Co.,* 20 Mont.
379, 51 Pac. 829; *First Nat. Bank* v. *Hall.* 8 Mont. 341, 345, 20

Pac. 638; *Bank of Deer Lodge* v. *Hope Min. Co.,* 3 Mont. 146, 35 Am. Rep. 458.)

Even though Weidenaar did not read the application because he could not, it was his duty to have the application read to him before he signed it, and his failure to do so renders him bound by its terms just as though he had read it. (*Lauze* v. *New York Life Ins. Co.* (N. H.), 68 Atl. 31.)

Declarations of an agent are not competent to establish his agency. (*Edmiston* v. *Hurley,* 30 Ky. Law Rep. 557, 99 S. W. 259; *Blair Baker Co.* v. *First Nat. Bank,* 164 Ind. 77, 72 N. E. 1027; *Fitzgerald* v. *Kimball Co.* (Neb.), 107 N. W. 227; *Pease* v. *Fink,* 3 Cal. App. 371, 85 Pac. 657; *Richards* v. *Newstifter,* 70 Kan. 350, 78 Pac. 824; *French* v. *Wade,* 35 Kan. 391, 11 Pac. 138; *Stollenwerck* v. *Thacher,* 115 Mass. 224; *Chicago etc. Ry.* v. *Fox,* 41 Ill. 106; *Rawson* v. *Curtis,* 19 Ill. 456; *Maxey* v. *Heckethorn,* 44 Ill. 437; *Howe Mach. Co.* v. *Clark,* 15 Kan. 492; *Harker* v. *Dement,* 9 Gill, 7, 52 Am. Dec. 670.)

*Messrs. Walrath & Patten,* for Respondent.

McBride, the "Agency Director" for appellant, was expressly authorized to assume a title which in itself suggests to the public the possession by that officer of general and full powers; he was the superior officer and supreme authority of appellant in the state of Montana, and the scope of his *actual* authority was to appoint, supervise and control the soliciting agents of appellant in this state. This, we contend, was a direct holding out of McBride as an officer having full powers in the matter of appointing soliciting agents, so as to give him, so far as third persons not having actual notice of any limitations were concerned, the ostensible authority to appoint sub-agents to solicit insurance, and bind the company by their acts. He was in law a *general agent* for appellant, as distinguished from a special agent, and ostensibly had full powers and authority in the matter of the appointment, supervision and control of appellant's soliciting agents in this state. (*Equitable Assur. Soc.* v.

*Brobst,* 18 Neb.. 526, 26 N. W. 204; *Insurance Co.* v. *Wilkinson,* 13 Wall. (80 U. S.) 222, 20 L. Ed. 617; *Goode* v. *Georgia Home Ins. Co.,* 92 Va. 392, 53 Am. St. Rep. 817, 23 S. E. 744, 30 L. R. A. 842; *Manufacturers' etc. Ins. Co.* v. *Armstrong,* 45 Ill. App. 217; *Kuney* v. *Amazon Ins. Co.,* 36 Hun, 66; *Hartford F. Ins. Co.* v. *Josey,* 6 Tex. Civ. App. 290, 25 S. W. 685.)

Persons dealing with insurance agents as to matters within the apparent scope of their authority are not affected by any unknown limitations thereof. (*Ruggles* v. *American Cent. Ins. Co.,* 114 N. Y. 415, 11 Am. St. Rep. 674, 21 N. E. 1000.)

That respondent, a foreigner, unable to read the English language, was not estopped by the provisions of the application, which was entirely filled out by Castleberry, appellant's agent, who knew Weidenaar's inability to read it, see *La Marche* v. *New York Life Ins. Co.,* 126 Cal. 498, 58 Pac. 1053; *Metropolitan Life Ins. Co.* v. *Larson,* 85 Ill. App. 143; *Nute* v. *Hartford F. Ins. Co.,* 109 Mo. App. 585, 83 S. W. 83; *Capital Fire Ins. Co.* v. *Montgomery* (Ark.), 99 S. W. 687; *Russell* v. *Detroit Mut. Fire Ins. Co.,* 80 Mich. 407, 45. N. W. 357; *McCarthy* v. *New' York Life Ins. Co.,* 74 Minn. 530, 77 N. W. 426; *McKay* v. *New York Life Ins. Co.,* 124 Cal. 270, 56 Pac. 1112; *Michigan Mutual Life Ins. Co.* v. *Reed,* 84 Mich. 524, 47 N. W. 1106, 13 L. R. A. 349; *Key* v. *National Life Ins. Co.,* 107 Iowa, 446, 78 N. W. 68.

A restriction prohibiting a soliciting agent from accepting a note instead of cash was not binding on respondent, if he had no knowledge, either actual or constructive, of it. (*Kilborn* v. *Prudential Ins. Co.,* 99 Minn. 176, 108 N. W. 861; *Starr* v. *Mutual Life Ins. Co.,* 41 Wash. 228, 83 Pac. 116; *Halle* v. *New York Life Ins. Co.* (Ky.), 58 S. W. 822; *Godfrey* v. *New York L. Ins. Co.,* 70 Minn. 224, 73 N. W. 1; *Teutonia Ins. Co.* v. *Ewing,* 90 Fed. 217, 32 C. C. A. 583; *Mutual Life Ins. Co.* v. *Logan,* 87 Fed. 637, 31 C. C. A. 172; *Kendrick* v. *Mutual B. L. Ins. Co.,* 124 N. C. 315, 70 Am. St. Rep. 592, 32 S. E. 728; *Capital F. Ins. Co.* v. *Montgomery* (Ark.), 99 S. W. 687.).

MR. JUSTICE SMITH delivered the opinion of the court.

The complaint in this action contains the following allegations: That on December 21, 1904, one W. J. McBride was a duly authorized and acting general agent and agency director of the defendant company in the state of Montana, with office at Butte, and as such had the authority to appoint agents of the defendant to solicit applications for insurance in the state; that on said date the defendant, through and by its said general agent, W. J. McBride, and one J. Sam Castleberry, who at the time was an agent duly authorized by McBride to take such application, solicited and took plaintiff's application for a policy of life insurance in the sum of $5,000; that on the date of the taking of said application Castleberry induced plaintiff to execute to him and one E. E. Saunders, for the use and benefit of defendant, and in payment of the first premium on the policy, a certain promissory note for $462.30, bearing date December 21, 1904, due four months after date, payable to said Castleberry and Saunders, at the National Bank of Gallatin Valley, with interest at eight per cent per annum from date until paid, and defendant at said time, through its said agent, Castleberry, delivered to plaintiff its receipt for said promissory note, wherein it was provided that in case plaintiff's application was not accepted by the company no policy should be issued, and the promissory note should be canceled and returned to plaintiff; that the application was forwarded by Castleberry to the general agent McBride, at his office in Butte, and the same was thereupon subscribed by McBride as the agent of defendant; that on the thirteenth day of March, 1905, defendant notified plaintiff that his application was rejected, but neither defendant, nor McBride, nor Castleberry, had returned or offered to return the note; that on the twenty-third day of December, 1904, Castleberry negotiated, sold, and assigned the note to the National Bank of Gallatin Valley, and on the twenty-fourth day of July, 1905, plaintiff paid the same, amounting to $383.90; that defendant, prior to the payment of the note by plaintiff, had refused on demand to

pay the same, and has not paid to plaintiff any part of the sum so paid by him to the bank.

The defendant by answer denied that it ever solicited or took plaintiff's application for insurance; denied that either Castleberry or Saunders was its agent at any time mentioned in the complaint; and denied any knowledge or information sufficient to form a belief as to the transactions between Castleberry and Saunders and the plaintiff, or either of them, concerning the note. After admitting that Castleberry forwarded the application to McBride, and that McBride subscribed the same as general agent of the company, it alleged affirmatively that neither Saunders nor Castleberry was its agent, and that neither of them had ever been appointed, or "pretended to be appointed," or held out, by defendant or McBride, as an agent. It then proceeds:

"(3) That shortly after the twenty-fourth day of December, 1904, an application for life insurance in the sum of $5,000 in the defendant company, purporting to be signed by plaintiff, was submitted at the office of defendant in the city of Butte, in the state of Montana, to said W. J. McBride, who was requested to submit the same to defendant for action, and for that purpose to sign his name thereto as agent. That said W. J. McBride was ignorant of any of the transactions with plaintiff alleged in the complaint to have been had by said Saunders and Castleberry, or either of them, and neither he or said company, or any of its officers or agents, ever had any knowledge of said alleged transactions until long after the application of said plaintiff for insurance had been declined, as hereinafter set forth.

"(4) That the said W. J. McBride, being in ignorance of such alleged transactions, and supposing and believing that said application was submitted in good faith and had been properly obtained, forwarded the same to the home office of this defendant in New York City, where the same was afterward declined, and said plaintiff notified accordingly of such declination.

"(5) That by said application, so signed by said plaintiff, the plaintiff made the following agreements therein contained and

set forth: '(I.) That no statements, promises, or information made or given by or to the person soliciting or taking this application for a policy, or by or to any other person, shall be binding on the company, or in any manner affect its rights, unless such statements, promises, or information be reduced to writing, and presented to the officers of the company, at the home office, in this application. * * * (IV.) That any payment in advance on account of premium shall be binding on the company only in accordance with the agent's or cashier's receipt therefor on the company's authorized form.'

''That a part of said application so signed by plaintiff reads as follows:

" 'Statement to be signed by applicant upon payment of the premium or any part thereof.

" 'Dated at ————, 1904.

" 'I hereby declare that I have paid to —— dollars in cash, and that I hold his receipt for same corresponding in date and number with this application.

" '[Signature of Applicant]

" '————————.'

''And that all of said quoted language is in plain, clear print on said application so signed by said plaintiff. That the company's authorized form of receipt mentioned in said contract, as aforesaid, was attached to and a part of said contract at the time of said signature by plaintiff, and plaintiff failed to sign said statement above set out, or to fill the blanks in the same in any manner whatever, and the same was left entirely blank upon said application, and said authorized form of receipt was left attached to said application and entirely blank, although said receipt provides: 'Fourth. That the liability of the company under this receipt shall not exceed the sum declared by the applicant in his application to have been paid, and that this receipt is non-negotiable, and cannot be assigned or transferred.'

" (6) And by reason of the premises defendant says that plaintiff is, and in good conscience and equity ought to be, con-

cluded and estopped from in any way showing or alleging that
this defendant is liable to him by reason of said note mentioned
in the complaint, or by reason of any of the transactions in said
complaint set forth.''

A reply was filed, putting in issue the affirmative allegations
of the answer, and then alleging:

''(1) That at the time the plaintiff signed an application for
a policy of life insurance to be issued by the defendant
company on the twenty-first day of December, 1904, as alleged
in the plaintiff's complaint herein, the said J. Sam Cas-
tleberry, as the agent of the defendant as alleged in the com-
plaint herein, presented the said application to plaintiff for
signature after all blanks therein had been filled out by the
said Castleberry, and the said Castleberry thereupon stated
to plaintiff the contents of said application. That the plain-
tiff is a foreigner by birth, to wit, a native of Holland.
That the plaintiff is unable to read the English language to any
extent at all, being able to read only simple matter when
printed in large type, and does not write the English language
more than to write his own name. That plaintiff, by reason of
his lack of knowledge of the English language, was not able to
read the application so prepared for his signature by the said
Castleberry, and did not read the same, and that plaintiff was
entirely dependent upon the statements of the said Castleberry
as to the contents thereof.

''(2) That at the time of the signing of the said application
by plaintiff as aforesaid the said Castleberry well knew that the
plaintiff could not read the English language so as to be able to
read the said application and know the contents thereof from
such reading. That, if the said application so signed by said
plaintiff as aforesaid contained any such provisions as are set
forth in paragraph 5 of the further and affirmative defense
set forth in said defendant's answer, or   if the said applica-
tion had attached to it an authorized form of receipt with
the provision numbered 4, as set forth in said paragraph
5 of said affirmative defense, the said Castleberry falsely

and fraudulently, and with intent to deceive and defraud the plaintiff, concealed such facts from plaintiff. That the said Castleberry did not state to the plaintiff that the said application to be signed by plaintiff, and which was signed by plaintiff, as aforesaid, contained any such provisions as are set forth in said paragraph 5 of said affirmative defense contained in said defendant's answer; nor did the said Castleberry state to plaintiff that any such 'statement to be signed by the applicant upon payment of the premium, or any part thereof,' as is· set forth in said paragraph 5 of said affirmative defense contained in defendant's answer, should be filled out and signed by plaintiff; nor did either the said Saunders or the said Castleberry request plaintiff to sign said statement; nor did either the said Saunders. or the said Castleberry state to plaintiff that there was any authorized form of receipt attached to the said application, or state to plaintiff any of the provisions set forth in any such receipt; nor did the said Castleberry or the said Saunders read to plaintiff, or in any wise inform the plaintiff of any of said facts set forth in said paragraph 5 of said affirmative defense of said answer.

"(3) That the plaintiff, in ignorance of any such facts as are alleged in paragraph 5 of the affirmative defense contained in said defendant's answer herein, and believing the statements so· made by the said Saunders and Castleberry with reference to the contents of said application to be true, and in reliance thereon, signed the said application, and delivered the same to the said Saunders and Castleberry, and delivered to the said· Saunders the said promissory note, as in the complaint herein alleged.''

The cause was tried to the court sitting without a jury. There were no findings of fact. The court entered judgment for the full amount claimed by the plaintiff, and from the judgment. and an order denying a new trial the defendant appeals.

Many errors are assigned, but those I shall consider are fairly comprehended within the scope of these two assignments: (1) That the court erred in overruling defendant's motion for a

nonsuit; and (2) that the evidence is insufficient to support the
decision of the court.

Plaintiff introduced the evidence of E. R. Perkins, second
vice-president of the defendant company, to the effect that Mc-
Bride was an agency director of the company, without power or
authority himself to appoint or employ soliciting agents, but
with authority to carry on preliminary negotiations and recom-
mend men for that position, the appointment and employment to
be made by the agency department of the home office, in every
case, by written contract, executed at the home office on behalf
of the company; that McBride, by contract, dated November 7,
1904, was allowed a salary of $200 per month, and also a first
year's commission of sixty per cent on business personally pro-
cured by him; that during the year 1905 he was to be allowed
additional compensation, provided the new insurance procured
by new agents brought into the service of the company by him
amounted to certain specified amounts, the amount of compensa-
tion being governed by the volume of new insurance procured;
that neither Saunders nor Castleberry was the agent of the de-
fendant for any purpose during the times mentioned in the
complaint.

McBride testified that he did not know Saunders and never
saw him; that he had never appointed either Castleberry or Saun-
ders a soliciting agent for the company. He produced the orig-
inal application of the plaintiff for insurance, containing, among
other things, the matters set forth in the defendant's answer.
Following the blank receipt recited in the answer, the application
contained this: "Received from  *  *  *  at  *  *  *  , state
of  *  *  * , this  *  *  *  day of  *  *  *, 1904, the sum
of  *  *  *  dollars, the sum declared by the applicant in his
application to have been paid in cash, on the following conditions
and agreements:

"First. That if a policy be delivered on the application for
insurance made by the above this day to the New York Life In-
surance Company, corresponding in date and number with this

receipt, said company shall accept this receipt as cash towards payment of the first premium on the said policy.

"Second. That this receipt will not be valid if issued for any sum in excess of the sum declared by applicant in such application to have been paid. It will not be valid if issued after December 31, 1904. It will not be valid if erasures or additions have been made in the printed form. It will not be valid unless the person to whom it is issued is promptly examined by a regularly appointed examiner of the New York Life Insurance Company.

"Third. That, if a policy be not issued on said application and examination within sixty days from this date (and only in that event), said sum will be returned on surrender of this receipt to the company.

"Fourth. That the liability of the company under this receipt shall not exceed the sum declared by the applicant in his application to have been paid, and that this receipt is non-negotiable, and cannot be assigned or transferred. (Agent must sign here) ————, Agent. * * * Names and addresses of every agent to whom this business belongs and his share in the amount of the policy: Name: W. J. McBride. Address: Care Butte, Mont. Share: All."

McBride then continued: "On or about December 14th or 15th of the year 1904, one morning about 11 o'clock, a gentleman came into my office, introducing himself as J. S. Castleberry, of Bozeman, Mont., stating that he was representing the Continental Life Insurance & Investment Company, of Salt Lake City. I talked with him a little while in the usual way, and after a few minutes he told me that he had a case which his company had declined, as he thought, for no good reason, and he wanted to know if I would care to submit it to our company. I asked him about the matter, and from what he told me I thought the man might get a policy with the New York Life, so I told him that I would be glad to submit it to the New York Life in my name, and would regard it as a brokerage business, and, if the policy was issued, would allow him a brok-

erage commission of 25 per cent. After vainly trying to persuade me to allow a larger commission, he finally said: 'Well, then, if you will let me have an application blank and the name of your examiner, I will get the application signed up to-morrow when I go back to Bozeman, and will have the party examined for your company, and send it in to you.' I then explained to him that, inasmuch as I was going to forward it in my own name, he need not witness the signature of the applicant, but that I would do that when it was received. This man Castleberry had with him papers and letters which warranted me in believing him to be all right, from every standpoint, and I felt that I was perfectly safe in pursuing this course. The application did not come to me on the next day, or the day after, but on December 29th, the day on which same was forwarded to the home office. Mr. Castleberry came again to the office in person, and came into my room, and handed me the application and medical examination. No coupon receipt was detached, and there was nothing to show that any kind of a settlement had been made. After taking the papers and looking over them I saw that they were to all appearances correct, and told Mr. Castleberry that I would send them off that night and when the policy came would promptly notify him. He then took a check-book out of his pocket and drew a check for $5, saying that was the amount which the applicant had paid him, but that he did not give him a receipt for the same as he did not think he had the authority to sign a New York Life receipt. I told him he did exactly right, and that the $5 which he was giving me would be reported in suspense, and if for any reason the policy was not issued as applied for, or was declined outright, the $5 would be refunded. The matter dragged along until March 2, 1905, during all of which time I considered everything regular and straight. The notice of the case being declined was received by my office on March 7th; and on that date the cashier drew a check for $5, making the check payable to the order of the applicant, J. E. Weidenaar, and I wrote a letter to Mr. Castleberry on that date notifying him of the com-

pany's action, inclosing the check, asking him to deliver it to Mr. Weidenaar and obtain from him a voucher for the same. To that letter I have never received a reply.''

Plaintiff testified as follows: ''I live in the Holland settlement, a few miles west from Bozeman. The first time Castleberry came to my place he came as agent for the Continental of Salt Lake City, and he wanted to get me a life insurance policy, and I gave him that application for $5,000, and after that I was rejected. I could not say exactly what time it was that this second trip was made by Castleberry with Saunders to my place. Saunders claimed he was agent of the New York Life. He came there, and Mr. Castleberry introduced Mr. Saunders to me, and he says: 'Here is an agent for the New York Life.' He says: 'We can get you a better policy in the New York Life, but it would cost a little more.' I don't understand. I am a Dutchman. When it comes down to the very point, I know nothing. I gave him an application for life insurance. I gave him a note. I don't know the name, but I gave him my note. I renewed that note at the bank. I gave another note instead of it when it came due. The note reads as follows:

'' '$462.30.                    Bozeman, Mont., 12/21, 1904.

'' 'Four months after date, for value received, we jointly and severally promise to pay to the order of J. Sam. Castleberry and E. E. Saunders four hundred and sixty-two 30/100 dollars, with interest at 8 per cent per annum from date until paid, and with attorney's fees in addition to other costs, in case the holder is obliged to enforce payment at law.

'' 'JOHN E. WEIDENAAR.

'' 'Payable at the National Bank of Gallatin Valley, Bozeman, Montana.'

''Indorsed across the face: 'Paid 383.90 July 24, 1905, and note canceled.' Indorsed on back: 'J. Sam. Castleberry, Ed. E. Saunders. Paid $383.90 July 24, 1905.'

''I gave a note in place of this note. That note reads as follows:

" '$383.90.                Bozeman, Montana, July 24, 1905.

" 'Four months after date, for value received, we jointly and severally promise to pay to the order of the National Bank of Gallatin Valley three hundred eighty-three and 90/100 dollars, with interest at ten per cent per annum from date until paid, and with attorney's fees in addition to other costs, in case the holder is obliged to enforce payment at law.

" 'JOHN WEIDENAAR.'

"Indorsed across the front: 'National Bank of Gallatin Valley. Paid December 11, 1905.  Bozeman, Montana.'

"At the time I gave Castleberry this application and my note he told me he would take it over to Butte to McBride, and McBride wanted to take it over to New York.  Castleberry told me at that time that McBride was the head man for the state of Montana with the New York Life.  He told me, in relation to this application, that it would be a better policy than the other.  He says: 'If you pay so much down on it, you will get the bonds back if you do.'  He told me he got the blank application from McBride in Butte.  Saunders claimed he was the agent for the New York Life.  Castleberry did not tell me who sent him to me to take this application.  He says to me, this policy would be better for me than the other—than the Continental.  Saunders and Castleberry prepared the application that I signed.  I couldn't write it, you know.  One or the other wrote it and fixed it up for me.  When I gave Castleberry my note and application, he gave me a receipt, which reads as follows:

" 'Manhattan, Montana, Dec. 21, 1904.

" 'Received of Mr. John E. Weidenaar new note and papers for purpose of changing his policy to the bond policy, and all old papers and note is to be canceled and returned as soon as new papers reach home office.

" '[Signed]   E. E. SAUNDERS,

" 'Gen. Agent for Montana, Idaho, and Utah.

" 'J. SAM. CASTLEBERRY.'

"After I gave the application and note to Castleberry I was, not required to do anything else by him; but I took a medical examination in connection with this at Manhattan, where I went for that purpose on the second day after giving the application. I never received any policy of insurance. I was notified by letter that I was rejected. I do not know why I was rejected. Castleberry first wrote me an application for insurance. in the Continental, which was the company he was representing, and I gave a note for that premium for $382 or $383. The time I gave this $462.30 note was when Castleberry and Saunders came out to see me. At that time I had not been notified that the Continental had rejected me or my application, and they did not tell me at that time that I had been rejected. They simply told me that they thought I ought to have a better policy, a little more expensive one. They told me that I would get back this other note that had been given for the first policy, and I was to get it back right away. They would give this other one in and would give me it back. They told me that this first note was in the bank and they would put this second one in and bring it back, and I got the first one back. When I come to give the new note for $462.30, my note in the bank was for only $383. The bank first cashed that note. They afterward found Castleberry and Saunders were not any good, and were robbing the people, and they did not want to cash the new note that I gave for $462.30, and interest; so I really took up the Continental note, with interest. Saunders and Castleberry told me they would take this new note down to the bank and take up my $382 note and return it to me. This they did. When I gave my new note for $383.90, that was the amount of money that Castleberry had actually got on my first note, with interest. I did not on the day Castleberry and Saunders were at my place pay Castleberry $5 to be given to McBride. The only thing I did was to give that note."

Miss Lucy Weidenaar, a daughter of the plaintiff, testified that her father did not write English and did not read English well.

In the motion for nonsuit, interposed by the defendant, it was urged that there was no evidence showing or tending to show any liability of the defendant to pay the sum claimed on account of the transaction set forth in the complaint, and that there was no evidence showing or tending to show that either Castleberry or Saunders was the actual or ostensible agent of the defendant, or had any authority to bind the company.

For the defendant, W. J. McBride testified that at the time of receiving plaintiff's application he had no knowledge whatever of the note for $462.30. "I never heard of that note until after the application had been rejected." Regarding his part in the transaction, he said: "I did not give plaintiff any receipt, nor did I authorize Castleberry and Saunders, or either of them, to give a receipt at the time of taking the application for said policy, or at any other time. I, as representative of the New York Life, would have had authority to collect the premium; but I did not give or attempt to give Saunders or Castleberry, or either of them, any authority to collect any premium, or to take any note from plaintiff at the time of taking this application, or at any other time. I, as an agent of the company, had no power or authority at all to take notes from applicants for insurance in payment of premiums. When a note or other terms of settlement were taken, except cash, as I understand the rules of the New York Life Insurance Company, they are taken solely at the agent's risk. The company accepts cash only in settlement of premiums. I did not authorize Saunders or Castleberry, or either of them, to make any representations or agreements whatever on my behalf, or on behalf of the defendant company, at any time with reference to the application for the policy, and the collection of premiums, or any part thereof, or the execution of any note therefor. Neither of them made any report or representations, or otherwise gave information or intimation to me, that they had taken any note of plaintiff in the transaction above mentioned, or had executed any receipt or made any statements or representations or agreements for themselves or for me, or for the company, to plaintiff in regard to

said transaction, or any part thereof. I never saw the original receipt, and I did not know that plaintiff claimed to have such a receipt until April, 1905. Saunders was not the general agent of the New York Life Insurance Company in Montana, and I do know that he had no authority to give the plaintiff any such receipt in behalf of that company; and Castleberry was not the agent of the New York Life Insurance Company, nor did he have any such authority to give plaintiff any such receipt in behalf of the New York Life Insurance Company.''

John C. McCall, the secretary of the defendant company in New York, testified that the first information the company had of the transactions complained of by the plaintiff was a letter from the plaintiff, dated April 5, 1905; that neither Saunders nor Castleberry was at any time an agent for the company or in any way connected with it; that all soliciting agents employed in 1904 executed a contract when they were employed by the company; that no agent had any right or authority to take notes in payment of premiums on policies of insurance, and that it is contrary to the rules and instructions given to its agents for them to do so; that in the soliciting agent's contract it is agreed between the parties that the agent should have no authority to extend the time of payment of any premiums or to waive payment in cash.

William E. Moore testified on behalf of the defendant that at the time of trial he was agency director for the defendant company at Butte, and had been an agency director of the company since the year 1900, prior to which time he was a general agent. He said further: ''Our company instructs its directors of agencies that we cannot accept brokerage business. It is natural for us, or any individual, whether he has accepted it as it appears on its face as present, in taking that, to put it to our company for consideration, and we hold this policy until the cash is paid. When this policy is acted on, and we have it ready for delivery, unless the party in question can establish himself, we never leave it go out of our hands without taking cash. We consider there is a fixed charge for medical fees

which is paid. $3 and $2, to look the case up and get a few entries on paper—a pen picture. Now, in order to make the fee safe on that little charge, it is the rule that we require the $5 to be deposited by every one. That is for the physician. Should Mr. Castleberry or anyone else present a case to me, if he should not absolutely give me the $5, and I know those parties are absolutely good, we make a little tab; but, unless we are willing to make it good ourselves, we must collect the $5. The point is this: Brokerage business not only applies to the insurance agent, but an attorney, if you please. He brings the business in and says: 'I have a case, and I would like for your company to consider it, and what will you allow?' And we consider that as brokerage business. We pay less commission to-day, less than other people do. We cannot allow as much to the man that picks it up in a casual way. It is one of little value as brokerage. It has been our custom, and is to-day, that, where a piece of business like that comes in, that is, where a party brings business to you that is handled by anyone, we put some agent's name on it. Some agent's name goes on this business that is really under contract with the company. We will consider a risk, if presented to one of our branch officers; and it is a custom, perhaps of all our agents, to take a risk where it has been turned down, perhaps, by another company, for some cause. Very frequently we take business that other companies will not take. When business is brought to us by an outside man or somebody else, we take the position that the party who brings it is a friend of the other party. We have no right to bind him. He has no agreement signed with us, so we could not hold him as the applicant to us. We take a look at it, and, if it looks like physically good business to us, we may pass on it, and never turn it loose until we get the business. It is necessary to have it formally presented to us, if it comes in the shape of our application on one of our blanks. When that sort of business is first brought to us, they present the matter informally, and, if it is of such nature as we will undertake to

furnish them a blank to obtain the application in a formal way of the party and send it in to our company. This is the custom that exists in our company to carry on the brokerage business in the form I have stated. You can put it in that shape that we do it. That class of business has been frequently done in connection with our company by their agents and other parties. As to whether that has been done with the knowledge of our superior officers, I say we have a rule directly from New York. I cannot recall what that rule is now. We have, with limitations, a rule which permits agents of our company to accept business of that kind, in the manner that I have stated. I state that this brokerage business is understood by the officers of the company, and is a frequent occurrence in the work of our company, as a matter of courtesy.''

The plaintiff testified, in rebuttal, that at the time he gave Castleberry his application he had no knowledge of any rule of the company requiring a cash settlement of the first year's premium.

The foregoing is substantially all of the testimony in the case.

The following provisions of the Civil Code seem applicable:

''Sec. 3073. An agency is either actual or ostensible.

''Sec. 3074. An agency is actual when the agent is really employed by the principal.

''Sec. 3075. An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent, who is not really employed by him.''

''Sec. 3091. An agent has such authority as the principal, actually or ostensibly, confers upon him.

''Sec. 3092. Actual authority is such as the principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess.

''Sec. 3093. Ostensible authority is such as a principal, intentionally, or by want of ordinary care, causes or allows a third person to believe the agent to possess.

"Sec. 3094. Every agent has actually such authority as is defined by this title, unless specially deprived thereof by his principal, and has even then such authority ostensibly, except as to persons who have actual or constructive notice of the restriction upon his authority.

"Sec. 3095. An agent has authority: 1. To do everything necessary and proper and usual, in the ordinary course of business, for effecting the purpose of his agency: and, 2. To make a representation respecting any matter of fact, not including the terms of his authority, but upon which his right to use authority depends, and the truth of which cannot be determined by the use of reasonable diligence on the part of the person to whom the representation is made."

"Sec. 3114. A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without ordinary negligence, incurred a liability or parted with value, upon the faith thereof."

Let us first determine what authority was conferred upon Castleberry, either actually or ostensibly, assuming that he was the agent of the defendant. We have the testimony of Perkins that McBride had no authority to employ soliciting agents. McBride's contract, however, reads: "It is agreed that if, during the year beginning January 1, 1905,  *  *  *  the new insurance procured by new agents brought into the service of the company by you during said period," etc. It may be argued that during the year 1905, McBride's authority was enlarged in this respect, although I am of opinion that the only manner in which he could bring new men into the service of the company was in accordance with the rules testified to by Perkins. Note, also, that this clause of the contract relates, in terms, to the year 1905. The only evidence as to what McBride's authority was in 1904, when the note was given, is found in his testimony, wherein he says: "From October, 1904, to July, 1905, I was agency director of the Montana branch, which was located at Butte, Mont. During the term in which I was agency director I had authority from defendant to ap-

point, supervise, and control the agents of the company in the state of Montana, subject always to the approval of the home office." Again, it seems to have been established that the defendant company had knowledge that it was getting, in some cases, what was called "brokerage business," that is, business brought to its agents by outsiders who shared in the agent's commission. Of this, however, plaintiff had no knowledge and could not have relied upon it. The Code declares (section 3091, *supra*) that an agent has such authority as the principal actually or ostensibly confers upon him. The actual authority conferred upon Castleberry came wholly from McBride. He testified: "He [Castleberry] told me that he had a case that his company had declined, and he wanted to know if I would submit it to our company. I told him I would be glad to submit it to the New York Life in my name, and would regard it as a brokerage business, and, if the policy was issued, would allow him a brokerage commission of twenty-five per cent. He said: 'If you will let me have an application blank and the name of your examiner, I will get the application signed up to-morrow when I go back to Bozeman, and will have the party examined for your company and send it in to you.' I then explained to him that, inasmuch as I was going to forward it in my name, he need not witness the signature of the applicant, but that I would do that when it was received. On December 29th Castleberry came again to the office in person, and handed me the application and medical examination. * * * He then took a check-book out of his pocket and drew a check for $5, saying that was the amount the applicant had paid him, but that he did not give him a receipt for the same, as he did not think he had the authority to sign a New York receipt. I told him he did exactly right."

It seems clear to me that the only authority conferred upon Castleberry, either actual or ostensible, was to go to the plaintiff and receive his application and, in connection with that, a report from the medical examiner. Castleberry went to the plaintiff. He, at that time, was engaged in an attempt to de-

fraud either one or both of the parties to this action. Plaintiff had no evidence of what his actual authority was. He falsely told plaintiff that Saunders was an agent of the company, but did not claim to be an agent himself. Plaintiff, in a letter to McBride, said: "Castleberry himself claimed to be acting in a *special capacity* for the time being, and at that time stated that within a few days his contract would be signed, making him the regular authorized agent of the New York Life in this community." The only presumption that plaintiff could reasonably indulge at this time was that Castleberry was still the agent of the Continental Life Insurance Company. Indeed, in my judgment, the plaintiff's testimony shows conclusively that he so regarded Castleberry, and that he acted upon that presumption through the entire transaction. The only ostensible authority exhibited by Castleberry to the plaintiff was the application blank. It does not appear that he had a blank for the medical examiner. That was probably furnished by the medical man. If so, it was a day or so after plaintiff signed the note, and can have no bearing upon this part of the case.

The plaintiff is a foreigner by birth, unable to write the English language, with the exception of his name, or to read it well. His daughter says that Castleberry and Saunders "fixed up" the application and note, and thereupon her father signed the same. The expression "fixed up" only denotes that these men filled in the blank spaces and wrote out the note. No claim is made that they misled the plaintiff as to the contents of either, or attempted to deceive him as to what he was signing, or withheld anything from him relating to the papers. No such action was necessary. It does not appear that plaintiff exhibited any curiosity about what he was signing, that he attempted to read the application, or that he was able, personally, to know that it bore the name of the defendant company. No request was made to have the application or the note read over to him, although his daughter, his two sons, and a man named Boomer were present at the time. The record is silent as to whether any of them could read the application; but the fact remains

that the plaintiff signed it blindly, without any effort to learn its contents. Neither did he make any inquiries as to why Castleberry, not being the agent of the New York Life Insurance Company, should assume to act for it in any capacity. Plaintiff himself testified thus as to what Castleberry's statements to him were: "He told me he would take the application over to Butte to McBride, and McBride wanted to take it over to New York. He said he got the blank application from McBride in Butte, and Saunders claimed he was the agent of the New York Life. Castleberry didn't say who sent him to take my application; I don't know."

It appears to me that plaintiff relied entirely upon Saunder's statement, corroborated by Castleberry, that he was the agent of the defendant company. And, in effect, Castleberry told plaintiff exactly what the extent of his own authority, in relation to the application, was. At every stage of the proceeding plaintiff had it in his power to protect himself, and this, not by any action requiring effort on his part, but simply by refusing to sign his name to a paper, the contents of which were unknown to him. On the other hand, defendant had no opportunity to obtain any part of the proceeds of the note, save by the consent of Saunders, one of the payees, to indorse his name thereon. The note was not payable to the defendant, nor to Castleberry, as its agent, but to E. E. Saunders and J. Sam. Castleberry, as individuals; Saunders being an outside party to the affair so far as the defendant was concerned. Had it been made payable to the company, the defendant could have retained or returned the same at its option, and plaintiff would have suffered no injury. Neither Saunders nor Castleberry could have obtained the money on it without forgery. Had it been made payable to Castleberry, as a soliciting agent of the company, with full powers as such, I am not prepared to say that would not have been payment to the company, under certain circumstances. When plaintiff made his note payable to Saunders and Castleberry, he put it into the power of an

outsider to negotiate the same, jointly with Castleberry, and retain the proceeds.

The receipt given plaintiff, had he ascertained its contents, should have been notice to a reasonable man that an attempt was being made to defraud him.  No reference is made therein to the defendant company, and its phraseology seems to indicate a purpose, not so much to pay a premium to the defendant, as to get back plaintiff's first note, given under like circumstances of negligence.  Had the plaintiff exercised ordinary care, he would have ascertained from the application signed by him that it was therein declared that no statements, promises, or information made or given by or to the person soliciting or taking the application, or by or to any other person, should be binding on the company, or in any manner affect its rights, unless such statements, promises or information should be reduced to writing and presented to the officers of the company at the home office, *in the application;* that any payment in advance on account of premium should be binding on the company only in accordance with the agent's or cashier's receipt therefor, on the company's authorized form; that there was a form attached to the application which, when filled in, would be notice to the company that the insured claimed to have made a payment to the agent taking the application; that there was also attached another blank form, to be filled in and signed by the agent, showing the conditions under which the advance payment was made.  I am aware that a failure to observe or fill in these blanks will not and should not, in all cases, amount to a declaration by the insured that no payment had been made; but I think, in this case, consideration should be given to all parts of the transaction in determining whether plaintiff exercised reasonable care.  These recitals in the application were, to some extent, at least, binding upon the plaintiff under the circumstances disclosed by this record.  He cannot be heard to say that he relied upon so much of the application blank as disclosed the fact that it pertained to the business of the

defendant, but that he repudiates those provisions thereof beneficial to the company.

In my opinion, sections 3094, 3095, and 3114 of the Civil Code are decisive of this case. I think plaintiff must be charged with constructive notice, at least, of the restriction upon Castleberry's authority; that by the use of reasonable diligence he could have determined that the representations of Castleberry, upon which he now assumes to rely, were not true; and that the liability incurred by him, if any, was incurred through his own negligence. I am of opinion that he was guilty of such gross negligence in signing the note as precludes him from now claiming that the negligence of the defendant in intrusting Castleberry with the blank, was the cause of the situation in which he now finds himself. That Castleberry and Saunders were successful in their nefarious enterprise was due entirely, in my judgment, to a want of ordinary care on the part of the plaintiff. I also seriously doubt whether plaintiff in fact suffered any detriment in the business. The amount he was obliged to pay was no more than the amount due on his original note to the Continental Life Insurance Company, upon which he was presumably liable.

There is no question of ratification on the part of the defendant, because the testimony shows neither the company nor any of its officers or agents had any knowledge of the transaction between plaintiff, Castleberry, and Saunders, save what appeared on the face of the application, until long after the application had been rejected. (*Schnepel* v. *Mellen,* 3 Mont. 118; Civ. Code, sec. 3086; 1 Am. & Eng. Ency. of Law, 2d ed., 965.)

In the consideration of this case, many adjudications of the courts, in cases where life insurance companies were parties, have been examined, including all cases cited by the respondent. It seems to me that some courts, of the very highest respectability and learning, have taken judicial notice of matters which they were not by law authorized to judicially know, and have gone so far in holding insurance companies liable as to result in the application of different rules of contract law to

them than would have been applied to individuals under the same circumstances. I cannot agree that this may rightly be done. While I have no doubt that many life insurance solicitors resort to reprehensible means to obtain business, and sometimes commit crime, as was done in this case, I think the law should be applied, without prejudice, to all alike, and I feel certain that the same law that affords protection to a person dealing with an individual will, if properly construed and applied, afford equal protection to one dealing with a life insurance company.

The judgment and order appealed from should be reversed. The action not being in equity, or based upon an agreed statement of facts, a new trial should be ordered.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY concurs.

MR. JUSTICE HOLLOWAY: I dissent. I do not think there is any question of ostensible agency involved in this case, and therefore it is wholly immaterial that the plaintiff did not exercise that degree of care and caution which he ought to have observed. Castleberry either was or was not the agent of the insurance company. I am satisfied that he was such agent, and this, too, independently of what any of the witnesses may have said upon the subject. That McBride was the general agent of the insurance company in this state I think is perfectly clear. (*Kilborn* v. *Prudential Ins. Co.*, 99 Minn. 176, 108 N. W. 861.) That he could make Castleberry agent of the company (a) by virtue of the power implied by his contract of agency, and (b) by virtue of the fact that the custom which he observed in engaging in the so-called brokerage business was known to and approved by the company, is clear to my mind. (Civ. Code, sec. 3140.) That McBride did arm Castleberry with the necessary blanks to take plaintiff's application and secure his medical examination and send him forth for the purpose is clear.

If Weidenaar had passed a satisfactory medical examination, there cannot be any doubt that the company would have issued

a policy, and in that event plaintiff would have been insured by virtue of Castleberry's agency in the transaction. If Castleberry would have been the agent in the event plaintiff's application had been accepted, he was no less the agent in securing the application, although it was not accepted, for its nonacceptance was not based upon Castleberry's want of authority in soliciting the business. In procuring plaintiff's application, I think Castleberry was the soliciting agent of the insurance company, and, as such, he had authority "to do everything necessary and proper and usual, in the ordinary course of business, for effecting the purpose of his agency." (Civ. Code, sec. 3095, subd. 1.)

That the soliciting agent of this company had authority to accept payment of the first premium is equally clear. The blank applications furnished by the company disclose this fact, for the form of receipt to be given for such first premium is indorsed on every such application. I think it is a general rule that, "where the agent is authorized to accept the payment of premiums, he may exercise his discretion as to the mode of payment. He may, for instance, accept a note or a check, instead of the money." (May on Insurance, sec. 134.) The authorities in support of this principle are so numerous that only a few need be cited. (*Michigan Mutual Life Ins. Co.* v. *Hall*, 60 Ill. App. 159; *National Life Ins. Co.* v. *Tweddell*, 22 Ky. Law Rep. 881, 58 S. W. 695; *Carson* v. *Jersey City Ins. Co.*, 43 N. J. L. 300, 39 Am. Rep. 584; *Starr* v. *Mutual Life Ins. Co.*, 41 Wash. 228, 83 Pac. 116; *Kilborn* v. *Prudential Ins. Co.*, above.)

I do not think that any significance whatever can be attached to the fact that plaintiff's note was made payable to Castleberry and Saunders, and that they negotiated it. The company is in no worse situation than it would have been, had the first premium been paid in cash and the money embezzled by Castleberry. The breach of trust on the part of an agent cannot determine the question whether a contract of insurance had been actually consummated or the company rendered liable for the acts of its agent. I think the judgment ought to be affirmed.